92 So.2d 47

### Annie Ray HULING

v.

### STATE.

### 7 Div. 392.

Court of Appeals of Alabama.

Oct. 16, 1956.

Rehearing Denied Nov. 13, 1956.

John Patterson, Atty. Gen., and Robt. Straub, Asst. Atty. Gen., for the State.

PRICE, Judge.

The indictment charged murder in the second degree. Appellant was convicted of said charge and sentenced to fifteen years' imprisonment.

We paraphrase the testimony set out in the Attorney General's brief, which states fairly the salient facts adduced on the trial.

The evidence for the State tends to show that the deceased and appellant, his wife, visited the home of deceased's son, by a former marriage, on the morning of the day deceased was killed. The appellant stayed there all day, but the deceased left between 1:00 and 2:00 o'clock in the afternoon. There was an argument be-

Love & Hines, Talladega, for appellant.

tween the appellant and deceased just prior to the time deceased left. The deceased returned and there was another argument about 4:00 o'clock in the afternoon. During the course of these arguments the appellant was cursing and threatened to kill deceased several different times. These threats were expressed to the deceased and to other persons present.

Jesse Burroughs, a deputy sheriff, testified that he saw the body of the deceased near the corner of deceased's house and later saw the body at the funeral home. There was about an inch wound on the left side of his chest and on the left arm. Burroughs testified that he found a twelve gauge, single-barreled shotgun fifteen or twenty feet away from the body. He testified that when he got to the scene of the killing the appellant was present and was screaming and crying. She repeatedly stated that she didn't know why she did it.

The wound in the chest of the deceased was described by James A. Jordan, who helped prepare the body for burial, as being about as big as a silver dollar.

Mrs. Dussie Carter, next door neighbor and wife of appellant's brother, testified that she heard the shot and heard appellant call for Mr. Carter. Both ran to appellant's home and found her screaming and running around. Appellant stated to witness that she didn't know why she did it.

John Carter, appellant's brother, testified the deceased had gotten his shotgun prior to the killing, and identified the gun as his own.

Chester Carter testified that he was present at the scene shortly after the killing and that the appellant kept saying she didn't know why she did it. He also testified that the appellant said deceased had been beating her but that she didn't have to do it.

Testifying in her own behalf, appellant stated that on the day of the killing she and deceased went to his son's house about 10 in the morning, and that deceased began drinking as soon as he got there. It was her testimony that she had only one drink during the day. Deceased left the house about 1:00 o'clock and came back about 4:00 o'clock. When appellant asked him where he had been he told her it was none of her business. He was "staggering drunk" at the time. She stated she tried to go home but the deceased didn't want to go. She denied the threats attributed to her by the State's witnesses. It was her testimony that the son's wife and another woman took her home, and on the way home they told her deceased had told them she had called them bad names and they appeared to be angry. She was sitting in the car talking to these women when deceased came home.

When she went into the house deceased accused her of getting ready to go out with some one that night. About that time her sister and her husband came for a few minutes' visit. After they left, deceased went to milk the cow. When he came back, he said he was going to kill her, his son's wife, and another woman.

She further testified that when she went to bed he jerked her out of bed and knocked her down. He hit her on the side of the head about the same place where he had struck her some three weeks previously, as a result of which he had taken her to a doctor. She ran into the living room where he knocked her down again and tried to choke her. She ran out the front door and he followed her and knocked her down and beat and kicked her. As she was trying to get up he went to the car and came back with a shotgun. She managed to get the gun away from him and he picked up a brick and threatened to kill her. When he drew back his arm she shot him.

Bonnie Fordham, appellant's sister, testified that when she visited appellant shortly before the killing deceased was drunk and that she had seen deceased beat appellant on several occasions.

Largus Green testified he was with deceased a while on the afternoon he was.

killed and that deceased was drunk. He stated that deceased had a shotgun in the car and that he had four shells. The witness said deceased told him there were four people he wanted to get rid of.

Dussie Carter, recalled for rebuttal, testified when she ran to the scene immediately after the shot she tried to get a washcloth and some water from the house and found the screen latched from the inside and that she had to pull the latch off to get in.

There was considerable evidence by the State as to the bad character of appellant, and a number of witnesses testified to appellant's good character and reputation.

■ Appellant urges as error the action of the trial court in permitting a funeral director or undertaker to testify to the cause of death. The State showed that the witness graduated from a college of embalming and that he had been engaged in the business of undertaking and embalming for twenty-five years. He testified he saw the body of deceased at the funeral home, was permitted to describe the wound, and was then asked this question: "Based upon your observation and based on your experience and the training you have had in your profession I will ask you if, in your judgment, that wound caused his death?" Objection was made and overruled.

In Phillips v. State, 248 Ala. 510, 28 So. 2d 542, 546, the court restated the fundamental principles that only an expert can testify to the fatality of a wound, and that an undertaker, as such, is not an expert on the question as to the cause of death of a deceased. The court said further:

"But it is not necessary that a witness be shown to be a practicing physician before he can express an opinion as to the cause of death. The rule is stated in the recent case of Hicks v. State, supra (247 Ala. 439, 25 So.2d [139] 140), as follows: 'The nature of a wound or injury, its probable cause and effect can be stated by ex-

pert medical witnesses, or witnesses shown to be familiar with such question; such as, an undertaker, or other showing competency.' "

In the Phillips case, supra, it was held that in view of the predicate laid for the undertaker's testimony and the statement of his experience in observing and examining wounds and their effect, similar to the wounds he observed on deceased, the witness was shown to be qualified to give an opinion as to the fatality of the wounds.

The witness here was not shown to possess the requisite qualifications as laid down by the court in the Phillips case, supra. However, under all the evidence, the undisputed facts show the appellant fired a shotgun at deceased; that after the shot he took three or four steps and fell; that there was a wound the size of a silver dollar on his chest, which was bleeding profusely; and that he expired immediately.

The testimony of the undertaker did not relate to any disputed matter of evidence. We think the error complained of in the admission of such testimony was not prejudicial or harmful to the substantial rights of the accused. Supreme Court Rule 45, Title 7, Appendix, Code 1940.

■ Appellant's next contention is that the trial court erred in sustaining the State's objection to a question propounded to J. W. Huling, deceased's son, as to the number of acres of land owned by deceased at the time of his death. Counsel complains that by such ruling he was denied the right to show bias, interest or prejudice on the part of the State's witness. Immediately following this ruling the witness testified that after his father's death appellant executed to witness a deed conveying to him her interest in all of the property owned by deceased, with the exception of a few household items and a cow and calf, and that the amount of land involved was 194 acres.

Pretermitting a decision as to the materiality of the evidence sought by the ques-

602

tion, we hold that the refusal to admit the proof in the first instance, if error, was rendered harmless to the accused by the subsequent disclosure of the facts sought. Supreme Court Rule 45, Title 7, Appendix, Code 1940; Pressnall v. State, 16 Ala. App. 72, 75 So. 278; Jarrell v. State, 35 Ala.App. 256, 50 So.2d 767.

In rebuttal, Les Messer, a State witness, was asked whether or not he knew the character and general reputation of the appellant in the community in which she lived prior to June 12, 1955. There was a general objection to this question, which was overruled. The witness stated that he knew her reputation and that it was bad. He was then asked whether he knew the defendant's general reputation for truth and veracity. The defendant's objection to this question was overruled, but apparently the witness did not understand the question and did not answer it.

Appellant's insistence is that, although the defendant had testified as a witness, she had not presented any evidence as to her general character and the State did not have the right to put in issue the general character of the defendant, but was limited to a showing of her reputation for truth and veracity.

In Mealer v. State, 242 Ala. 682, 8 So.2d 178, 179, this exact question was presented and decided adversely to appellant's contention. The court stated that there are many cases holding that evidence of defendant's general character "is admissible to impeach a defendant on trial who has testified as a witness, just as it may be used to impeach any other witness in the case. * * * For impeachment purposes, the evidence of bad character need not extend beyond that of general character, but may be extended to include character for truth and veracity, if either the State or defendant wishes to do so. Cooley v. State, 233 Ala. 407, 171 So. 725; Baugh v. State, 215 Ala. 619, 112 So. 157; Gast v. State, 232 Ala. 307(9), 167 So. 554." See also, Adams v. State, 33 Ala.App. 136, 31 So.2d 99.

The court instructed the jury that the evidence of the defendant's bad character and her character for truth and veracity was admissible for the purpose of her credibility, "In other words to shed light on what weight you might give to her testimony in this case."

The evidence presented a question for the determination of the jury. Defendant's motion to exclude the evidence was properly denied and the affirmative charge in her behalf was refused without error. Neither did the court err in overruling the motion for a new trial.

The special written charges, requested by defendant, were correctly refused. Those not substantially covered by the court's oral charge or charges given at defendant's request assert incorrect legal principles, or are affirmative in nature.

No reversible error appears in the record, and the judgment of the trial court is affirmed.

Affirmed.